J-A22036-21

2022 PA Super 6

Z.P.                                           :      IN THE SUPERIOR COURT OF
                                               :           PENNSYLVANIA
                                               :
          v.                                   :
                                               :
                                               :
                                               :
K.P.                                           :
                                               :
                                               :
                                               :
APPEAL OF: COMMONWEALTH OF                      :
PENNSYLVANIA                                    :          No. 547 MDA 2021

Appeal from the Order Entered April 14, 2021
In the Court of Common Pleas of York County
Civil Division at No(s):  2019-FC-2270-03

BEFORE:  BOWES, J., OLSON, J., and KING, J.

OPINION BY KING, J.:                                    **FILED JANUARY 06, 2022**

Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the York County Court of Common Pleas, which placed limitations on the manner in which the Commonwealth was permitted to interview R.P. (d.o.b. June 2014) and A.P. (d.o.b. January 2016) ("Children") as part of its investigation into child abuse allegations against Z.P. ("Father").  For the following reasons, we reverse and remand for further proceedings.[1]

In its opinion, the trial court accurately set forth some of the relevant facts and procedural history of this case as follows:

In December 2019, K.P. (Mother) alleged that an incident

_____

[1] Although the Commonwealth included the parties' full names in the caption of its notice of appeal, we have changed the caption to reflect the initials of the parties, as the trial court record uses the parties' initials.  ***See*** Pa.R.A.P. 904(b)(1) (stating parties shall be stated in caption as they appeared on record of trial court at time appeal was taken).

occurred while Z.P. (Father) was putting cream on his son, R.P., who was 5 years old at that time. Mother and/or Maternal Grandmother then later alleged that something happened with his daughter, A.P., then age 3. York County Office of Children Youth and Families (CYF) became involved. Both children underwent forensic medical exams and interviews with a [Sexual Assault Forensic Examination ("SAFE")] nurse in December 2019. They then underwent separate forensic interviews at the Children's Advocacy Center (CAC) on multiple occasions. R.P. was interviewed in December 2019, January 2020, and June 2020. A.P. was interviewed in December 2019 and June 2020. [CYF] initially indicated the report for both children[.] Father, who was a teacher, was suspended without pay from his job. No criminal charges were ever filed, and Father appealed the CYF determinations.

On December 9, 2019, Mother filed for a Protection from Abuse (PFA) Order for herself and both children in action 2019-FC-002270-12. Father's parental rights were effectively suspended as of December 9, 2019 by Temporary Order based on the…allegations made by Mother in her PFA Petition. On April 6, 2020, Father filed a Complaint for Custody seeking physical and legal custody of the children. Some delays occurred in both cases due to the ongoing investigation. An Interim Order for Custody was entered by the court on May 26, 2020, granting Mother sole legal and primary physical custody of the children due to the ongoing CYF investigation into the allegations made by Mother. The Order directed that Father would have no rights of partial physical custody or visitation unless and until ordered by the [c]ourt. The parties agreed to entry of a final PFA Order on behalf of the children against Father on May 28, 2020. The order was entered without admissions to the allegations contained in the petition and provided that Mother was to have temporary physical custody of the [children] with Father permitted supervised contact with the children as the parties could agree.

From December 2019 through June 2020, Father had no contact with the children. A Pre-Trial Custody Conference was held on June 30, 2020. The resulting Order permitted Zoom calls in a therapeutic setting and scheduled a custody settlement conference for September 23, 2020. At the

Settlement Conference, issues were raised that required…a Threat of Harm hearing, which was scheduled for December 3, 2020. Additionally, the resulting Order gave counsel access to the CAC interviews, and counsel agreed that the court should view the CYF file *in camera*. The Threat of Harm hearing commenced on December 3, 2020, but it was not completed in the time allotted. The court did issue an order on December 3, 2020 expanding Father's rights from Zoom calls and therapeutic sessions to [supervised] visits….

The hearing was continued to February 19, 2021. The court heard from Dr. Casey Shienvold, who had evaluated Father for a threat of harm in accordance with 23 Pa.C.S.A. § 5329. Dr. Casey Shienvold opined that Father did not fit the profile for a perpetrator and did not pose a threat of harm. Dr. Arnold Shienvold performed psychological evaluations of both parents. He did not raise any significant issues with Father and notably opined that "Mother's religious beliefs appear to set the foundation for what she perceives as 'right' and 'wrong' and how she interprets it. She forms her opinions secondary to emotional reactions. After forming her opinion, Mother may then obsessively search for 'facts,' which again may be more emotionally then tangibly based, to prove her perceptions are 'true.'" (Father's Ex. E).

While CYF originally indicated a report on Father based on the alleged abuse, Father appealed the determination. CYF then declined to pursue the case, and on December 30, 2020, DHS ordered that the reports be expunged. At the time of the February 19, 2021 hearing, the PFA was vacated by agreement of the parties. Additionally, there did not appear to be a pending criminal investigation, and no criminal action had been taken. Therefore, the court modified the interim order to provide some custody for Father to be supervised by Paternal Grandmother. The threat of harm hearing was continued until April 5, 2021, which was supposed to have been in person with the court talking to the children. However, just prior to April 5, Mother's counsel informed the court and counsel that Mother and the children had been exposed to COVID. Even though no supporting documentation was provided, the court rescheduled the testimony of the children to an in-person interview on April 14, 2021, and proceeded with other testimony via Zoom on April 5. In accordance with

- 3 -

the prior agreement of counsel (N.T. 2/19/21 at page 218), the court watched the five CAC interviews of the children during the weekend prior to the April 5th hearing.

During the hearing on April 5, 2021, the [c]ourt was made aware that another referral was made against Father following his weekend of supervised custody. Counsel for CYF and the caseworker assigned were able to Zoom into court and report the status. The [c]ourt had the discussion off the record with all counsel and the caseworker present; but no parties [were] present as the discussion concerned an ongoing investigation. The caseworker was new to the case and was not [the caseworker] who had testified previously with regard to the other allegations. The court was informed that another CAC interview was scheduled on April 13, the day before the children's rescheduled testimony to the court. Additionally, there was some confusion as to whether Mother had contact with the children immediately following Father's weekend, and the caseworker may not have been aware that Mother taught at the school that the children attended. While the [c]ourt did not issue a separate Order, the court indicated that no one was to talk to the children, including the CAC, prior to the children's scheduled testimony nine days later. The CYF solicitor…was present and did not object.

The court then received a call from the District Attorney's office requesting an emergency meeting. As a courtesy, an Emergency Status Hearing was scheduled and held at 8:30 a.m. [on April 9, 2021] before other scheduled court business.

(Trial Court Opinion, filed May 11, 2021, at 2-7).

On the morning of April 9, 2021, the court informed the Commonwealth that it would be canceling the CAC interview scheduled with the Children for April 13th as part of the Commonwealth's child abuse investigation. The court stated that Children were "CAC'd out." (N.T. Hearing, 4/9/21, at 2; R.R. at 2a). The court expressed its concern that Children had already been

interviewed multiple times and Father had no unsupervised time with Children in over a year. The court explained that Children were "burned out from going over the same information over and over again." (*Id.* at 5; R.R. at 5a). Further, the court said it had "serious coaching concerns." (*Id.*)

The Commonwealth responded that the trial court lacked standing in the child abuse investigation to dictate if future interviews would occur. The Commonwealth maintained that there was a new allegation of abuse against Father, and the Commonwealth had a duty to investigate that allegation. Further, to the extent Mother or Maternal Grandmother might be coaching Children, the Commonwealth would investigate that as well because that could be a criminal issue.

In response, the trial court emphasized that it had jurisdiction over Children regarding the underlying custody matter and needed to act in Children's best interests. The court wanted any interviewers to familiarize themselves with the history of this case and watch any previous CAC interviews. Accordingly, the court issued the following verbal order:

> And now, this 9th day of April 2021, the [c]ourt is issuing an Order that no one will interview these children about any allegations involving sexual misconduct by Father unless he or she has read both of the reports by Dr. Shienvold, the transcript of all custody proceedings to date, and watched all of the prior CAC interviews.
>
> The [c]ourt is extremely concerned about coaching in this case of these children and CAC burnout. It was clear watching the interviews of the children in order that their descriptions of events became more specific rather than less specific over the time involved and that they made

- 5 -

extremely disparaging comments regarding Father and his family that were clearly coming from Mother and her family.

It was also clear that Father has undergone an extensive threat of harm assessment and that there has been a separate report where the psychologist concluded that Mother, rather than changing her view to fit the facts, changes her facts to fit her view.

The [c]ourt will be interviewing these children on the 14th of April 2021 and does not want their testimony tainted by an interview on the 13th by other individuals who are clearly not aware of the entire history of this case or the testimony this [c]ourt has taken thus far. The [c]ourt makes a specific finding that that would be harmful to the children at this point in time.

The [c]ourt will make the transcript of the children's testimony available to York County CYF and the York County District Attorney's Office. Additionally, under the circumstances, the [c]ourt will allow an attorney from the District Attorney's Office to be present for the children's interview by the [c]ourt on the 14th. If there are any questions that the District Attorney's office would like the [c]ourt to explore, they may be submitted in advance to the [c]ourt.

The [c]ourt will hold anyone in contempt who allows these children to be interviewed outside the parameters of this [c]ourt Order.

(*Id.* at 11-13; R.R. at 11a-13a). The court also indicated that it would be appointing a guardian *ad litem* ("GAL") for Children.

On April 13, 2021, the Commonwealth filed a notice of appeal, along with a certification stating the appeal was proper per Pa.R.A.P. 313 (involving

collateral orders).[2]  That same day, the Commonwealth also filed an application for emergency stay in this Court, asking this Court to stay and enjoin the trial court from conducting its scheduled interviews of Children on April 14th, and to enjoin the trial court from barring the Commonwealth from conducting a proper child abuse investigation as mandated by law.

The parties and the Commonwealth appeared before the court again on April 14, 2021.  The court referred the Commonwealth to Section 5329.1 of the Domestic Relations Code (consideration of child abuse and involvement with protective services) in support of its decision to place limitations on the Commonwealth's interview of Children.  (N.T. Hearing, 4/14/21, at 5; R.R. at 51a).  Under that statute, the trial court insisted CYF was required to fully cooperate with the court and assist the court in fulfilling its duties to determine if child abuse occurred in this case.  (**Id.** at 10; R.R. at 56a).  The court stated that it had a duty under Section 5329.1 to develop procedures to implement the provisions of that section and the statute required CYF to cooperate with the court—not the court to cooperate with CYF.  (**Id.** at 13-14; R.R. at 59a-

---

[2] The Commonwealth contends that it filed its concise statement of errors complained of on appeal along with the notice of appeal on April 13, 2021, consistent with Pa.R.A.P. 1925(a)(2)(i).  Nevertheless, the Commonwealth's Rule 1925 statement is docketed one day after the notice of appeal.  Even if the Commonwealth did not file its Rule 1925 statement contemporaneously with the notice of appeal, we can overlook this defect.  **See In re K.T.E.L.**, 983 A.2d 745 (Pa.Super. 2009) (holding failure of appellant in children's fast track case to file contemporaneously concise statement with notice of appeal will result in defective notice of appeal, disposition of which will be decided on case-by-case basis).

60a).

The Commonwealth informed the court that it filed a notice of appeal from the court's April 9, 2021 verbal order because it believed the child abuse investigation should proceed independently from the custody action. (*Id.* at 8; R.R. at 54a). The court then told the Commonwealth that it lacked standing to file a notice of appeal in the custody action because the Commonwealth had not filed a petition to intervene. Nevertheless, the court told the Commonwealth that if it moved to intervene in the custody action for the purpose of pursuing the already filed appeal, the court would grant that request. (*Id.* at 8-9; R.R. at 54a-55a). The court stated it still intended to interview Children that day.

The Commonwealth responded that it did not think the court could interview Children in light of the Commonwealth's notice of appeal. Additionally, the Commonwealth explained it filed the application for stay in this Court to prevent the trial court from interviewing Children to avoid any taint in the child abuse investigation. (*Id.* at 12; R.R. at 58a).

The court also clarified that it did not intend to prevent the Commonwealth from investigating but sought only to restrict the Commonwealth from interviewing Children due to the numerous CAC interviews Children had already undergone. The court noted that its April 9, 2021 verbal order had not even been filed yet when the Commonwealth filed its notice of appeal because the court had not yet reduced it to writing. In

any event, the court explained it intended to amend its April 9, 2021 order. (**Id.** at 29; R.R. at 75a). The court expressed its concern in this case, as well as others, where children in high conflict custody cases were being subject to multiple CAC interviews in a short timeframe, which the court did not believe were in the best interests of the children. (**Id.**) The court also stressed its belief that a GAL should have the option of being present at such interviews if doing so would further the best interests of the children. (**Id.**)

The court remarked:

> I have lost trust in the CAC because we have a problem. We have a problem that law enforcement and the DA's office when you take the position you've got to talk to these kids every time [there is an allegation of abuse] is becoming that problem. It's compromising the credibility of these kids, it's compromising the credibility of the parents, it's compromising the credibility of the process, and it's making everybody unwitting partners in a pattern of harassment, and I have a concern about that. Now, no judge wants to put kids into a situation where they are being abused, but the standard isn't, oh, the kids might be abused if possibly we put them with dad. In this case it's preponderance of the evidence. Now I know in child abuse cases we want to err on the side of making sure these children are safe, but I also have to follow the law. And if you're going to do an investigation it has to be one that I have confidence in because ultimately I am the decision maker. And I don't have confidence in the process right now, and that is the bigger problem you have. And we need to work cooperatively to solve that, okay?

(**Id.** at 30-31; R.R. at 77a-78a). The court reiterated that it sought only to limit the Commonwealth's interviews with Children—not to impede the child abuse investigation in any other way. (**Id.** at 34-35; R.R. at 80a-81a). Specifically, the court said it was "restraining [law enforcement] from…talking

to children without appropriate safety measures in place to guarantee that [Children] will not be psychologically harmed and they won't need to be talked to about the same set of incidents repeatedly by multiple individuals." (*Id.* at 37; R.R. at 83a).

The Commonwealth interjected that the new allegations the Commonwealth sought to investigate were not necessarily the same as older allegations already discussed with Children. (*Id.* at 42; R.R. at 88a). The court stated it was under the impression the new allegation came about after Children's first weekend with Father since the initial abuse allegations and pertained to Father and Paternal Grandfather. The court was concerned about Mother's involvement in that allegation. (*Id.* at 43; R.R. at 89a). The court then entered the following amended order:

> And Now, this 14th day of April 2021, the [c]ourt is issuing an order that no one interview these children about any allegations involving sexual misconduct by father or grandfather unless he or she has read both of the reports by the Dr. Shienvolds, the transcript of all of the custody proceedings to date and watched all of the prior CAC interviews.
>
> Additionally, no interview of the children shall be conducted by any attorney or law enforcement without the permission of the GAL and attorney appointed in this case, Lori Yost. Attorney Yost need not be present for the interview if she feels that it is not necessary to protect the interest of her client. However, a decision by her to be present for any interview, including an interview at the CAC, is solely at the discretion of the GAL looking at protecting the interest of her clients.
>
> The [c]ourt is extremely concerned about coaching in this case of these children and CAC burnout. It was clear

watching the interviews of the children in order that their description of events became more specific rather than less specific over time and that they made extremely disparaging comments regarding father and his family that were clearly coming from Mother and her family.

The [c]ourt has also heard testimony from Dr. Shienvold regarding evaluations of father, mother and the situation involving the threat of harm…. Dr. Arnold Shienvold opined that mother rather than changing the view to fit the facts, is changing the facts to fit her view. The [c]ourt feels it is important for any interviewer to understand the context in which allegations are being made.

(*Id.* at 48-49; R.R. at 94a-95a). The court further noted it was appointing the GAL as Children's legal counsel as well. Additionally, the court ordered that any violation of its order would constitute contempt. (*Id.* at 50; R.R. at 96a).

The Commonwealth then made an oral motion to intervene in the case, which the court granted. (*Id.*) No party objected to the Commonwealth's motion. At that point, the Commonwealth noted it was in receipt of this Court's grant of the application to stay the trial court from interviewing Children until further order of Court.[3] (*Id.* at 51; R.R. at 97a). The custody trial then continued, with the exception of the court's interview of Children.[4]

_____

[3] This Court's order did not rule on the Commonwealth's additional request to enjoin the trial court from prohibiting the Commonwealth from proceeding with its child abuse investigation.

[4] The court heard testimony from Mary Glunt, a preschool teacher at A.P.'s school, and from Mother.

- 11 -

The Commonwealth now raises one issue in this appeal:[5]

> Chapter 63 of the Domestic Relations Code mandates that law enforcement conduct a criminal investigation into suspected child abuse allegations that may violate Pennsylvania criminal laws. In this civil action in which the Commonwealth was not a direct party, the trial court as a collateral matter has barred the Commonwealth, through the Office of the District Attorney and other agencies, from conducting a criminal child abuse investigation including a forensic interview of the suspected minor complainants at the York County Children's Advocacy Center. Did the trial court exceed the scope of its authority and violate Title 23, Chapter 63 by prohibiting the Office of the District Attorney and/or law enforcement from conducting its criminal investigation into suspected child abuse?

(Commonwealth's Brief at 4).

As a preliminary matter, "the appealability of an order directly implicates the jurisdiction of the court asked to review the order." *Estate of Considine v. Wachovia Bank*, 966 A.2d 1148, 1151 (Pa.Super. 2009). Pennsylvania law makes clear:

> [A]n appeal may be taken from: (1) a final order or an order

---

[5] Because the court's verbal April 9, 2021 order was not reduced to writing or entered on the docket when the Commonwealth filed its notice of appeal, and given that the court did not even grant the Commonwealth standing in this matter until April 14, 2021, we will treat the Commonwealth's notice of appeal as from the April 14, 2021 amended order, and relate it forward to that date. *See In re L.M.*, 923 A.2d 505 (Pa.Super. 2007) (stating order is not appealable until it is entered on docket with required notation that appropriate notice has been given). *See also* Pa.R.A.P. 905(a)(5) (stating notice of appeal filed after announcement of determination but before entry of appealable order shall be treated as filed after such entry and on day thereof). Thus, we disagree with the Commonwealth's contention that the April 14, 2021 amended order was a "legal nullity" where the appeal was already pending (*see* Commonwealth's Brief at 38 n.128), as the Commonwealth's appeal prior to entry of any written docketed order was premature.

- 12 -

certified as a final order (Pa.R.A.P. 341); (2) an interlocutory order as of right (Pa.R.A.P. 311); (3) an interlocutory order by permission (Pa.R.A.P. 312, 1311, 42 Pa.C.S.A. § 702(b)); or (4) a collateral order (Pa.R.A.P. 313).

*Stahl v. Redcay*, 897 A.2d 478, 485 (Pa.Super. 2006), *appeal denied*, 591 Pa. 704, 918 A.2d 747 (2007). A final order in a civil case is one that disposes of all the parties and all the claims; or is entered as a final order pursuant to the trial court's determination under Rule 341(c). **See** Pa.R.A.P. 341(b)(1), (3). "[A] custody order will be considered final and appealable only after the trial court has completed its hearings on the merits and the resultant order resolves the pending custody claims between the parties." **G.B. v. M.M.B.**, 670 A.2d 714, 715 (Pa.Super. 1996) (*en banc*).

A collateral order is defined in Rule 313 as follows:

**Rule 313.  Collateral Orders**

\* \* \*

**(b)  Definition.** A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P. 313(b).

"With regard to the first prong of the collateral order doctrine, an order is separable from the main cause of action if it is entirely distinct from the underlying issue in the case and if it can be resolved without an analysis of the merits of the underlying dispute." **K.C. v. L.A.**, 633 Pa. 722, 729, 128

A.3d 774, 779 (2015) (internal citation and quotation marks omitted). Regarding the second prong, "a right is important if the interests that would go unprotected without immediate appeal are significant relative to the efficiency interests served by the final order rule." *Id.* at 730, 128 A.3d at 779. "[I]t is not sufficient that the issue under review is important to a particular party; it 'must involve rights deeply rooted in public policy going beyond the particular litigation at hand.'" *Stahl, supra* at 485. Concerning the third prong, whether a party's claims will be "irreparably lost" if review is postponed turns on the particular facts and circumstances of each case. *See K.C., supra*; *G.B., supra*.

Instantly, the record makes clear the court's April 9, 2021 verbal order and April 14, 2021 amended order did not resolve all of the custody issues between the parties. Consequently, there was no "final" order for purposes of Rule 341. *See* Pa.R.A.P. 341(b); *G.B., supra*. Nevertheless, the Commonwealth has certified that the appeal is proper under Rule 313. As to the first prong of the collateral order doctrine, we agree with the Commonwealth that the order placing limitations on the Commonwealth's interview with Children is separable from the underlying custody dispute between Mother and Father. *See K.C., supra*. Regarding the second prong of the test, we also agree that the right at issue—the Commonwealth's ability to conduct a child abuse investigation without interference from a custody court—is a right too important to be denied review. *See id.* Finally, we agree

with the Commonwealth that its right would be irreparably lost if we denied review, because the Commonwealth would then have to follow the dictates of the court's restrictions to conduct its child abuse investigation. *Id.* Therefore, we agree the appeal is properly before us pursuant to the collateral order doctrine. *See* Pa.R.A.P. 313(b).

On appeal, the Commonwealth argues that the trial court exceeded its authority by unilaterally canceling a forensic interview of Children that were the subject of sex abuse allegations and by imposing requirements on law enforcement before any interviews with Children. The Commonwealth contends that the trial court erroneously relied on Section 5329.1 of the Domestic Relations Code to impede the Commonwealth from proceeding with its child abuse investigation, where that statute only grants the trial court authority in custody settings. The Commonwealth admits that Section 5329.1 grants the trial court authority to interview children during a custody trial regarding abuse allegations to make an informed custody decision. The Commonwealth further concedes that it had no authority to prohibit the trial court from interviewing Children during the custody trial. Nevertheless, the Commonwealth insists the trial court had no authority under Section 5329.1 to interfere with a child abuse investigation. The Commonwealth emphasizes that Section 5329.1 also does not require law enforcement to assist the court. The Commonwealth stresses that the court's actions constituted "judicial overreach" into a child abuse investigation. (Commonwealth's Brief at 31).

By contrast, the Commonwealth highlights that Section 6334.1 of the Domestic Relations Code (responsibility for investigation of suspected child abuse) requires the Commonwealth to investigate allegations of child abuse. Unlike Section 5329.1, which expressly authorizes the trial court's role in child abuse custody settings, the Commonwealth submits that Section 6334.1 does not reference the judiciary at all. The Commonwealth suggests that if the legislature wanted the judiciary to have a role in child abuse investigations in non-custody settings, then it would have included such language in Section 6334.1. The Commonwealth further relies on Section 6365 of the Domestic Relations Code, which charges the District Attorney's Office, not the trial court, with convening a multidisciplinary investigative team regarding child abuse allegations. The Commonwealth claims the trial court lacked jurisdiction over Children as it relates to any child abuse investigation and maintained jurisdiction over Children only as it pertains to the specific custody action before it.

The Commonwealth further argues that the court abused its discretion by ordering the GAL to have decision-making powers as it relates to a child abuse investigation. The Commonwealth avers that the GAL cannot serve as a gatekeeper to law enforcement engaging in a child abuse investigation. The Commonwealth proclaims it has no obligation to discuss a pending child abuse investigation with the GAL, and the GAL cannot unilaterally decide if she will be present for an interview with Children as it relates to a child abuse

investigation.[6] The Commonwealth concludes the trial court abused its discretion and exceeded the scope of its authority by interfering with a child abuse investigation, and this Court must reverse and remand with instructions that Children are permitted to be interviewed pursuant to the child abuse investigation protocols of York County. For the following reasons, we agree with the Commonwealth's position.

Issues involving statutory construction are questions of law, for which our standard of review is *de novo* and scope of review is plenary. ***Shafer Elec. & Const. v. Mantia***, 626 Pa. 258, 96 A.3d 989 (2014).

> Under [the rules of statutory construction], we must interpret and construe the challenged statute in a manner that ascertains and effectuates the full intention of the legislature. 1 Pa.C.S. § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b). We must further assume that the legislature did "not intend a result that is absurd, impossible of execution or unreasonable." *Id.* § 1922(1). Finally, it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include.

---

[6] The Commonwealth also argues that the trial court's decision was motivated by bias and ill-will against the District Attorney's Office and the CAC. (***See*** Commonwealth's Brief at 32-44). Nevertheless, the Commonwealth did not preserve this claim of error in its Rule 1925 statement, so it is waived on appeal. ***See In re A.B.***, 63 A.3d 345 (Pa.Super. 2013) (reiterating general rule that issues not raised in concise statement of errors are waived on appeal). To the extent the Commonwealth contends that the court did not demonstrate bias until the April 14, 2021 proceeding, which was after the Commonwealth had already filed its concise statement of errors, the Commonwealth did not seek to supplement its concise statement to raise this additional claim.

***Shafer, supra*** at 266, 96 A.3d at 994 (some internal citations omitted).

Our review of this appeal implicates the interplay of different sections of the Domestic Relations Code. Section 5329.1, on which the trial court relied at the April 14, 2021 hearing, falls under Chapter 53 of the Domestic Relations Code, and applies to disputes relating to child custody matters. ***See*** 23 Pa.C.S.A. § 5321 (scope of chapter). Section 5329.1 provides as follows:

> **§ 5329.1 Consideration of child abuse and involvement with protective services**
>
> **(a) Information sharing.**—In accordance with section 6340(a)(5.1) (relating to release of information in confidential reports), **where a party seeks any form of custody**, subject to the examination of the parties, **the court shall determine**:
>
> (1) With respect to child abuse under Chapter 63 (relating to child protective services) or a child who is a victim of a crime under 18 Pa.C.S. (relating to crimes and offenses) which would constitute abuse under Chapter 63:
>
> (i) Whether the child is the subject of an indicated or founded report of child abuse.
>
> (ii) Whether a party or a member of the party's household has been identified as the perpetrator in an indicated or founded report of child abuse.
>
> (iii) The date and circumstances of the child abuse.
>
> (iv) The jurisdiction where the child abuse investigation took place.
>
> (2) With respect to child protective services or general protective services under Chapter 63:
>
> (i) Whether a party or a member of a party's household has been provided services.

(ii)    The type of services provided.

(iii)    The circumstances surrounding the provision of services.

(iv)    The status of services.

(v)    The date the services were provided.

(vi)    The jurisdiction where the services were provided.

**(b)    Cooperation**.—The following apply:

(1)    **The Department of [Human Services] and the county children and youth social service agency shall fully cooperate with the court and assist the court in fulfilling its duties under this section**.

(2)    The Department of [Human Services] and the county children and youth social service agency shall fully cooperate with the governing authority in order to implement the provisions of this section.

(3)    The governing authority shall develop procedures to implement the provisions of this section.

(4)    As used in this subsection, the term "governing authority" shall have the meaning given to it in 42 Pa.C.S. § 102 (relating to definitions).

23 Pa.C.S.A. § 5329.1 (emphasis added) (internal footnote omitted).  ***See***

***also*** 23 Pa.C.S.A. § 5328(a)(2.1) (requiring trial court to consider information

set forth in Section 5329.1(a) as part of 16-factor custody analysis in making

custody determination).

Section 6334.1, on which the Commonwealth relies, falls under Chapter

63 of the Domestic Relations Code, known as the Child Protective Services

Law ("CPSL").  ***See*** 23 Pa.C.S.A. § 6301.  The purpose of the CPSL is to:

encourage more complete reporting of suspected child abuse; to the extent permitted by this chapter, to involve law enforcement agencies in responding to child abuse; and to establish in each county protective services for the purpose of investigating the reports swiftly and competently, providing protection for children from further abuse and providing rehabilitative services for children and parents involved so as to ensure the child's well-being and to preserve, stabilize and protect the integrity of family life wherever appropriate or to provide another alternative permanent family when the unity of the family cannot be maintained. …

23 Pa.C.S.A. § 6302(b). Thus, the CPSL "tasks county Children and Youth Agencies with investigating reports of suspected child abuse or neglect. The CPSL defines 'child abuse' for reporting purposes and outlines specific considerations an agency must assess and tasks it must perform to complete its investigation. Further actions are authorized dependent on the conclusions reached." *Interest of D.R.*, ___ Pa. ___, ___, 232 A.3d 547, 548 (2020).

Upon receipt of a report of child abuse, a county agency is required to immediately initiate an investigation. 23 Pa.C.S.A. § 6368. Under Section 6334.1, titled "Responsibility for investigation":

The department shall establish procedures regarding the following different responses to address suspected child abuse and protective services depending on the person's allegedly committing the suspected child abuse or causing a child to be in need of protective services:

(1) If the suspected child abuse is alleged to have been committed by a perpetrator, the appropriate county agency shall investigate the allegation as provided in this chapter.

(2) **If the suspected child abuse is alleged to have been committed by a perpetrator and the behavior constituting the suspected child abuse may include a**

- 20 -

**violation of a criminal offense, the appropriate county agency and law enforcement officials shall jointly investigate the allegation through the investigative team established in section 6365(c) (relating to services for prevention, investigation and treatment of child abuse) and as provided in this chapter.**

(3)    If the suspected child abuse is alleged to have been committed by a person who is not a perpetrator and the behavior constituting the suspected child abuse may include a violation of a criminal offense, law enforcement officials where the suspected child abuse is alleged to have occurred shall be solely responsible for investigating the allegation.

(4)    If a child is alleged to be in need of other protective services, the appropriate county agency shall assess the needs of the child as provided in this chapter.

23 Pa.C.S.A. § 6334.1 (emphasis added).  A "perpetrator" includes a parent

of the child at issue.  *See* 23 Pa.C.S.A. § 6303 (definitions).  Additionally,

under Section 6365:

A multidisciplinary investigative team shall be used to coordinate child abuse investigations between county agencies and law enforcement.  **The county agency and the district attorney shall develop a protocol for the convening of multidisciplinary investigative teams for any case of child abuse by a perpetrator involving crimes against children** which are set forth in section 6340(a)(9) and (10) (relating to release of information in confidential reports).   The county multidisciplinary investigative team protocol shall include standards and procedures to be used in receiving and referring reports and coordinating investigations of reported cases of child abuse and a system for sharing the information obtained as a result of any interview.  **The protocol shall include any other standards and procedures to avoid duplication of fact-finding efforts and interviews to minimize the trauma to the child.   The district attorney shall convene the multidisciplinary investigative team in accordance with the protocol.**  The multidisciplinary investigative team shall consist of those individuals and

agencies responsible for investigating the abuse or for providing services to the child and shall at a minimum include a health care provider, county caseworker and law enforcement official.

23 Pa.C.S.A. § 6365(c) (emphasis added).

Instantly, the trial court explained its reasons for placing limitations on the Commonwealth's child abuse investigation, as follows:

> Under [Section 6365(c)], the Commonwealth is directed to have and implement standards and procedures to "avoid duplication of fact-finding efforts and interviews to minimize the trauma to the child." But if not the court, who holds them to those standards? Additionally, the DA is to "convene" the multidisciplinary team. Does that mean that they are totally in control and can run roughshod over everyone else? Under 6365(c), the DA and CYF are team members and one cannot simply overrule the other on a matter. If CYF and the DA disagree, should they be able to come to the court to help resolve the dispute, or does the DA get to dictate to CYF, who had no issues with the court's action, how the investigation is to be conducted? It is the DA's position that the court can grant no relief and that we lack the authority to resolve any dispute. The court should have the authority at least to make sure the DA follows this statute, which they are not doing.
>
> *    *    *
>
> [I]n this particular case, R.D. had undergone three interviews at the York CAC within the span of 7 months with a fourth forensic interview and exam by a [SAFE] nurse. The prior CYF caseworker had also testified that a separate investigation had been conducted in Cumberland County during the same time period, possibly with additional interviews. …[T]he children were last interviewed in June 2020. With the exception of some possible information involving paternal grandfather, all interviews covered the same incidents as the children had no contact with Father outside of a therapeutic setting between December 2019 and December 2020. All contact since December 2020 has been supervised.

The DA does not represent children, nor should it allow itself to become a tool of the accusing parent in a high-conflict custody case. The DA represents the Commonwealth. … Children, especially young children, should not be subjected to a CAC interview every time an allegation is received, nor should it constitute the entire investigation. **There is no requirement that every investigation requires even one, let alone multiple CAC interviews.** No child should be subjected to even one potentially traumatic CAC interview unless there is a likelihood that it can meet the legal standard for admissibility or result in information that would further the investigation. Additionally, at least someone present should be familiar with the child and/or the evidence in ongoing complex cases such as this one. CAC interviews are designed to be less traumatic for child victims, but that is hardly the same as not traumatic.

\* \* \*

… Perhaps more importantly than any decision by [the Superior Court] or the [trial] court, the DA is not hearing what the court is telling them, specifically there are serious issues with their CAC interviews regarding frequency, timing, and bias. If the judges do not trust that these interviews are happening in an unbiased way, respecting children's rights and putting the best interests of the children first, then they have much bigger problems than any limits the court places on the children's interviews here.

(Trial Court Opinion at 18-24) (emphasis in original) (internal citations omitted).

In further support for its decision, the trial court cited law from other jurisdictions that purports to afford greater protection to Children than the procedures implemented by York County in conducting its child abuse investigations. (*Id.* at 26-27). According to the trial court, "two trends have emerged. The first trend is an increased recognition of children's rights. The

second trend is a recognition of systemic trauma. The policies and practices developed and used by the DA have failed to recognize these trends and the law's movement in that direction." (*Id.* at 27).

The trial court went on to cite Section 5329.1, noting that the trial court's contact on the investigative team is CYF, not the DA's office. (*Id.* at 27-29). Additionally, the trial court relied on Section 6365(c), to support its position that the GAL should be part of the multidisciplinary investigation team and permitted to be "present" to observe the interview just as the caseworker would. (*Id.* at 30-31). The trial court opined that "[t]he DA's 'best practices' [to exclude the GAL from the interview] may be more historical and fail to consider the more recent attention to reducing trauma and respecting children's rights." (*Id.* at 32). The trial court expressed its concern that child abuse interviews can occur at the CAC without anyone present to protect the children's rights or best interests. In the trial court's view, a GAL is in the best position to balance minimizing trauma while furthering the child abuse investigation. (*See id.* at 33-38). Consequently, the trial court advocates that a GAL should always be informed, have an opportunity to object, and be able to be present with the investigative team in the other room during the CAC interview. (*Id.* at 40).

The trial court also expressed its unease that Mother might be coaching Children, and whether Children are able to distinguish "the truths they experience from the 'truth' they may have been told by Mother and her family

for the past year." (*Id.* at 46). The court indicated that the prior CAC interviews spent about three hours exploring what Father might have done but less than three minutes exploring Mother's possible manipulation or alienation of Father. (*Id.* at 47). The court stated that it intends to balance "the extensive questioning regarding Father with at least some questions regarding Mother and Mother's family" when the court conducts its interview as part of its custody trial. (*Id.* at 47-48). The trial court concluded by expressing its worry about the rights, mental health, and best interests of the most vulnerable children becoming lost in the absence of the limitations set by the court in this case. (*Id.* at 51-52).

Although we recognize the trial court's serious concerns regarding the child abuse investigatory process, and genuine attempt to act in the best interests of Children, we agree with the Commonwealth that the trial court exceeded the scope of its authority in this case. There is no dispute that the trial court had the authority to interview Children and act to protect Children's best interests as it pertains to the custody action. As well, the trial court had a duty to consider any allegations of child abuse in rendering its custody decision. *See* 23 Pa.C.S.A. §§ 5328(a)(2.1); 5329.1. Notwithstanding the trial court's reliance on Section 5329.1(b), which requires the Department of Human Services and CYF to fully cooperate and assist the court in fulfilling its duties under Section 5329.1 (*see* 23 Pa.C.S.A. § 5329.1(b)), the provisions on which the court relies apply **only** to disputes relating to child custody

matters (*see* 23 Pa.C.S.A. § 5321) and do not mention law enforcement.

The court's duties under Section 5329.1 concerning the abuse allegations as part of rendering the custody decision are independent of the duties of CYF and law enforcement to investigate suspected child abuse under the CPSL. Section 6334.1 makes clear that if the suspected child abuse is alleged to have been committed by a perpetrator, which includes a parent, and the suspected child abuse might constitute a criminal offense, CYF and law enforcement officials shall jointly investigate the allegation through the investigative team established in Section 6365(c). *See* 23 Pa.C.S.A. § 6334.1. Section 6365 requires that "[t]he county agency and the district attorney shall develop a protocol for the convening of multidisciplinary investigative teams for any case of child abuse by a perpetrator involving crimes against children" and the county multidisciplinary investigative team protocol "shall include any other standards and procedures to avoid duplication of fact-finding efforts and interviews to minimize the trauma to the child. The district attorney shall convene the multidisciplinary investigative team in accordance with the protocol." 23 Pa.C.S.A. § 6365(c). "[T]he county agency and law enforcement officials shall cooperate and coordinate, to the fullest extent possible, their efforts to respond to and investigate reports of

suspected child abuse."[7]  23 Pa.C.S.A. § 6346(c).

Under a plain reading of the relevant provisions of the CPSL, the trial court has no authority to establish the investigatory protocol, or place limits on how the District Attorney and CYF follow that protocol.  *See* 23 Pa.C.S.A. §§ 6334.1, 6346(c), 6365(c).  Put simply, nothing in Section 6334.1 or 6365(c) of the CPSL contemplates a custody court's role in the investigatory process.  *See* 1 Pa.C.S.A. § 1921(b) (stating: "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit").  Significantly, "it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include."  *See Shafer, supra* at 266, 96 A.3d at 994.  To the extent that other jurisdictions might give the court a different role in the investigatory process or implement different procedures than those used in York County, we are not bound by those decisions.  *See Eckman v. Erie Insurance Exchange*, 21 A.3d 1203 (Pa.Super. 2011) (observing well-

_____

[7] We note that the while the CPSL establishes joint investigative teams between county agencies and law enforcement officials for some reports of child abuse, and that the investigations might overlap, "each investigation serves a different ultimate purpose: police investigate to determine whether a crime was committed, whereas [the county agency] investigates to determine whether it should administratively designate a report of child abuse as indicated, which triggers inclusion in the statewide database of child abuse perpetrators."  *Commonwealth v. Kane*, No. 2509 EDA 2018, 2020 WL 2781553, at *8 (Pa.Super. filed May 28, 2020) (unpublished memorandum) (internal footnotes omitted).  *See also* Pa.R.A.P. 126(b) (providing that unpublished non-precedential memorandum decisions of Superior Court filed after May 1, 2019 may be cited for their persuasive value).

settled law that this Court is not bound by decisions of federal courts, other than United States Supreme Court, or decisions of other states' courts).

We do not make light of the trial court's grave concerns in this case. Nevertheless, any problems with the timing, frequency, and other procedures employed during child abuse investigations are matters best left to the legislature to address. *See Benson ex rel. Patterson v. Patterson*, 574 Pa. 346, 349, 830 A.2d 966, 967 (explaining "it is not the role of the judiciary to legislate changes in the law which our legislature has declined to adopt").

We highlight that the CPSL mandates the establishment of citizen review panels to examine "[p]olicies, procedures and practices of State and local agencies and, where appropriate, specific cases to evaluate the extent to which State and local protective services system agencies are effectively discharging their child protection responsibilities[.]" 23 Pa.C.S.A. § 6343.1(b). "Each citizen review panel shall meet not less than once every three months[,]" and "[t]he department shall issue an annual report summarizing the activities and recommendations of the panels and summarizing the department response to the recommendations." 23 Pa.C.S.A. § 6343.1(d), (e). Additionally: "A committee of the Senate designated by the President pro tempore of the Senate and a committee of the House of Representatives designated by the Speaker of the House of Representatives, either jointly or separately, shall review the manner in which this chapter has been administrated at the State and local level" for the

purposes of, *inter alia*, "[e]nabling the General Assembly to determine whether the programs and services mandated by this chapter are effectively meeting the goals of this chapter." 23 Pa.C.S.A. § 6384(2). Thus, the legislature has set forth specific processes for evaluating whether the policies, procedures and practices of the county agencies are effectively ensuring the protection of children.[8]

Based upon the foregoing, we hold that the trial court lacked authority to dictate the manner in which the Commonwealth and CYF conducted its child abuse investigation in this case. Accordingly, we reverse the April 14, 2021 amended order placing any limitations on the Commonwealth's interview with Children, and remand with instructions that the Commonwealth be permitted

_____

[8] We also observe that the Pennsylvania Commission on Crime and Delinquency details the various requirements forensic interviewers must undergo to conduct forensic interviews of Children. Forensic interviews are provided by a multidisciplinary team with specialized training in conducting forensic interviews and are required to have successfully completed specific training and education. Forensic interviewing of alleged victims of child abuse, in the context of a multidisciplinary team response, is considered specialized and requires additional specialized training prior to conducing the forensic interviews. Additionally, individuals who conduct forensic interviews at the CAC must participate in a structured peer review process for forensic interviewers a minimum of twice a year, as a matter of quality assurance. Participation in peer review assures that forensic interviewers remain current and further develop and strengthen their skills based on new research and developments in the field that impact the quality of their interviews. The forensic interview standard as a whole reflects the National Children's Alliance forensic interview standard for CAC accreditation. ***See*** Pennsylvania Commission on Crime and Delinquency: Forensic Interviews of Children, at https://www.pccd.pa.gov/Victim-Services/Documents/Forensic%20Interviews%20of%20Children.pdf (last visited November 17, 2021).

to interview Children pursuant to the procedures established in York County. We also lift the stay prohibiting the trial court from interviewing Children in the custody trial.

Order reversed. Case remanded with instructions. Jurisdiction is relinquished.

Judge Olson joins this opinion.

Judge Bowes files a concurring statement.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/06/2022